# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JANICE PARKER, | ) | CASE NO. 4:20-CV-1240 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | **)** | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Janice Parker ("Plaintiff" or "Parker"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is VACATED and REMANDED for further consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On July 8, 2016, Parker filed an application for DIB, alleging a disability onset date of April 26, 2016, and claiming she was disabled due to anxiety, arthritis in her left arm, chronic obstructive pulmonary disease ("COPD"), depression, and high blood pressure.  (Transcript ("Tr.") at 62.)  The applications were denied initially and upon reconsideration, and Parker requested a hearing before an administrative law judge ("ALJ").  (Tr. 102-3.)

On April 30, 2019, an ALJ held a hearing, during which Parker, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 29-59.)  On May 7, 2019, the ALJ issued a written decision finding Parker was not disabled.  (*Id*. at 10-28.)  The ALJ's decision became final on April 2, 2020, when the Appeals Council declined further review.  (*Id*. at 1-7.)

On June 5, 2020, Parker filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 18, 19.) Parker asserts the following assignments of error:

> (1)  The RFC determination is unsupported by substantial evidence because the ALJ failed to properly weigh the opinion of the state agency medical consultants, the only medical opinions of record.
>
> (2)  The ALJ's RFC determination is unsupported by substantial evidence as he failed to properly account for Plaintiff's subjective complaints.

(Doc. No. 16 at 1.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Parker was born in 1958 and was 57 years-old at the time of her alleged onset date, making her an "individual of advanced age" under Social Security regulations on the alleged disability date.  (Tr. 21.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  During the relevant period, she changed age

2

category to "closely approaching retirement age" under Social Security regulations. (*Id*.) She has at least a high school education and is able to communicate in English. (*Id.*) She has past relevant work as a service technician. (*Id*.)

**B.      Relevant Medical Evidence[2] - Physical Impairments[3]**

On February 15, 2016, Parker sought treatment for breathing difficulties including severe shortness of breath, chest congestion with difficulty expectorating, and wheezing. (Tr. 344.) On examination, Parker had diminished auscultation and expiratory wheezes. (*Id*. at 580.) Jamie Black, PA-C treated her with Solu-Medriol in the office; prescribed Mucinex, nebulized albuterol, Levofloxacin and a prednisone taper; and gave her a work excusal letter. (*Id*. at 346.)

On February 25, 2016, Parker returned to PA Black for a follow up appointment. (*Id*. at 584.) She reported that she stopped taking prednisone after one day because it caused her to be very irritable and mean, but did complete the antibiotics. (*Id*.) She reported some improvement, but was still struggling with her breathing. (*Id*.) On examination, Parker had audible rhonchi with laughter or cough, diminished auscultation, and expiratory wheezes. (*Id*. at 587.) PA Black noted Parker had a persisting exacerbation of her COPD.   (*Id*. at 588.)  PA Black prescribed Parker Mucinex, nebulized albuterol and Rayos for her breathing and gave her a work excusal letter. (*Id*. at 589.)

On March 9, 2016, Parker returned to PA Black and reported that despite overall improvement, her breathing was still not back to her baseline, and she continued to have residual

---

[2]      The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]      No severe mental impairments were identified by the ALJ, and Parker does not challenge that conclusion. (Tr. 15.)  Therefore, the parties did not cite mental health evidence, an the Court does not consider it herein.

3

cough, wheezing, and nasal congestion.  (*Id*. at 591.)  On examination, Parker had diminished auscultation and expiratory wheezes. (*Id*. at 594.) PA Black assessed Parker with chronic bronchitis presentation related to her COPD, noting her severe exacerbation from February 2016 continued to persist. (*Id*. at 595.)  PA Black noted this progress was slowed due to Parker's intolerance to oral corticosteroids.  (*Id*.)  PA Black increased her dosage of Rayos and gave her a work excusal letter. (*Id*. at 596.)

On March 21, 2016, PA Black noted Parker reported overall significant improvement in her breathing since her last visit, but complained of continued problems with chronic shortness of breath and wheezing. (*Id*. at 598.)  Parker also reported irritability and sleep disturbances with increased dosage of Rayos (extended release prednisone), but was able to tolerate a dosage of 5 mg.  (*Id*.)  On examination, Parker continued to had diminished auscultation and expiratory wheezes. (*Id*. at 601.) PA Black assessed Parker with presentation of chronic bronchitis and again noted Parker's severe exacerbation from February 2016 had been slow to improve, but described her as "now much better." (*Id*. at 602.)  He deemed her ready to return to work on March 27, 2016.  (*Id*. at 603.)

On May 5, 2016, Parker returned to PA Black for a follow up visit, reporting her breathing had remained mostly stable, and that she was sleeping much more after retiring from her work, which was on a night shift.  (*Id*. at 605.) On examination, Parker had expiratory wheezes on forced expiration in both lungs.  (*Id*. at 608.)  PA Black noted Parker continued to have chronic bronchitis presentation as well as difficulty tolerating the higher medications due to irritability and mood changes, and her overall breathing had improved since retirement.  (*Id*. at 609.)

On May 17, 2016, Parker established care with Ehreema Nadir, M.D. (*Id*. at 390.) She reported her left shoulder pain was uncontrolled, and requested an orthopedic referral. (*Id*.)  On

4

examination, her lungs were clear to auscultation bilaterally, with no wheezes, rales or rhonchi. (*Id*.) Dr. Nadir referred Parker to undergo a bone density examination. (*Id*.)

On May 18, 2016, Parker underwent a bone density scan which showed her bone density was in the range of osteopenia. (*Id*. at 396.)

On June 14, 2016, Parker returned to Dr. Nadir and reported her left shoulder pain was worsening to the point where she could not lift anything, and again requested an orthopedic referral. (*Id*. at 384.) On examination, her lungs were clear to auscultation bilaterally, with no wheezes, rales or rhonchi. (*Id*.)

On June 30, 2016, Parker initiated treatment with Danton Dungy, M.D. P.C., at Dungy Orthopedic Center, and reported constant, moderate left shoulder pain which had begun six months prior to her visit, and worsened with elevation or lying down. (*Id*. at 398.) On examination, Parker had no swelling or effusion, an full range of motion, but also pain and weakness with rotator cuff strength testing as well as positive impingement signs. (*Id*. at 400.) An x-ray showed her left shoulder was "essentially unremarkable," although it showed downsloping of the acromion and assessed Parker with left shoulder pain due to impingement. (*Id*. at 402.) Dr. Dungy administered a cortisone injection to the left shoulder, and instructed Parker to not perform any overhead activities other than normal activities of daily living. (*Id*. at 400.)

On August 11, 2016, Parker returned to Dr. Dungy and reported the cortisone injection helped considerably after her last visit, but she continued to have mild residual pain after the injection. (*Id*. at 436.) On examination, she had improved range of motion in her left shoulder, some pain with impingement and rotator cuff strength testing, and no weakness. (*Id*.) Dr. Dungy performed another cortisone injection in Parker's left shoulder. (*Id*.)

On December 9, 2016, Parker established care with Kristen Evan Hymes, D.O. (*Id*. at 647.) Parker reported dyspnea, cough and wheezing, and stated her COPD prevented her from walking more than one hundred feet and caused difficulty on stairs. (*Id*.) On examination, her chest was clear to auscultation, with no wheezes, rales, or rhonchi, and symmetric air entry. (*Id*. at 649.)

On August 21, 2017, Parker treated with Becky Goodson, NP at the offices of Dr. Nadir and reported worsening fatigue, muscle spasms in her neck, and numbness and weakness in her upper arms. (*Id*. at 459.) On examination, Parker had bruising to both arms, cervical and upper arm tenderness, and full range of motion in her back, shoulders and all extremities. (*Id*.) Her lungs were clear to auscultation. (*Id*.) NP Goodman referred Parker to obtain an x-ray of her cervical spine. (*Id*.)

October 15, 2018, Parker returned to Dr. Hymes and reported she could only walk several feet before resting, and her dyspnea symptoms worsened after several flights of stairs. (*Id*. at 658.) On examination, her chest was clear to auscultation, with no wheezes, rales, or rhonchi, and symmetric air entry. (*Id*. at 660.) Her gross motor exam and gait were normal. (*Id*.)

On February 18, 2019, Parker returned to Dr. Hymes and reported breathing difficulties, including congestion and wheezing, that had been gradually worsening over many days. (*Id*. at 665.) On examination, Parker had diminished, globally coarse breath sounds with wheezing, no rales or rhonchi, and symmetric air entry. (*Id*. at 666.) Dr. Hymes assessed Parker with a COPD exacerbation and prescribed Doxycycline hyclate and prednisone. (*Id*. at 667.)

**C.      State Agency Reports - Physical Impairments**

In the initial review, State Agency reviewing physician, Carol Hutchinson, D.O., reviewed the record and determined the "evidence supports a light level of exertion. Due to reported threshold,

a med-voc allowance is anticipated." (*Id*. at 65.)  Dr. Hutchinson opined Parker had the following functional limitations:

- lift twenty pounds occasionally, and ten pounds frequently;

- sit or stand about six hours each in a normal workday;

- occasionally climb ramps, stairs, ladders, ropes, and scaffolds;

- occasionally crawl;

- frequently balance, stoop, kneel, and crouch;

- limited reach left in front, laterally, and overhead;

- avoid concentrated exposure to temperature extremes, humidity, and vibrations; and

- avoid even moderate exposure to fumes, odors, gasses, and poor ventilation.

(*Id*. at 68-9.)

On February 20, 2017, State Agency reviewing physician Robert Mitgang, M.D., concurred with Dr. Hutchinson's opinion, but further limited Parker to only occasionally balancing, kneeling, and crouching. (*Id*. at 79, 82.)

**D.      Hearing Testimony**

During the April 30, 2019 hearing, Parker testified to the following:

- She moved here from Arizona.  She previously worked as a process technician in a computer chip factory, and they offered her retirement because she had worked there more than 15 years and was more than 55 years old.  She was already having a hard time with her breathing and everything, so she took the retirement payout. (Tr. 35.)

- In her job as a process technician, she would lift about 20 pounds, and sometimes more.  The tools she worked with were very large, and she was responsible for changing out parts.  (*Id*. at 36.)

- She stopped using a CPAP machine in 2014, after she had gastric bypass surgery. The surgery was unsuccessful.  (*Id*.)

7

- She retired voluntarily, because she had to take custody of her granddaughter.  She did not medically have to stop working.  (*Id*. at 37.)

- In her job as a process technician, she would lift up to 75 pounds replacing parts in the machines.  She also used alcohol and a lot of different chemicals to clean the and refill the machines.  She had to mix at least 10 gallons of chemicals to refill tanks within the tool itself.  The smells of the chemicals would bother her, and she would become short of breath.  Sometimes she had to walk a mile between tools, and this was hard for her.  (*Id*. at 38-9.)

- She had many, many hospitalizations and call-offs prior to her retirement.  The biggest reason she decided to take retirement was because she was missing a lot of work because of her breathing.  When other people got colds, she would get bronchitis and be out for weeks.  (*Id*. at 40.)

- She realized she had a problem at least ten years ago, because she had pneumonia four times in one year.  Her breathing has improved since retirement. (*Id*.)

- She is no longer using a CPAP for her sleep apnea.  The insurance company collected it after her surgery.  She underwent a sleep study in October 2017, and they recommended she use a CPAP.  (*Id*. at 41.)

- She had a bursa in her right shoulder.  They tried to fix it with shots, but the pain returned about six months after each shot. She can now lift only about ten pounds. (*Id*. at 41-2.)

- She has tried working a few times since moving to Ohio.  First, she was going to be an engraver at Things Remembered.  That job was at a warehouse, and the dust and everything bothered her.  After a week there, she got physically ill. (*Id*. at  44.)

- The second job she tried was at a candy place.  She couldn't handle the standing and the smells.  (*Id*.)

- The third job she tried was at a Subway.  She enjoyed working with people, but "It seemed like the more you did, the more they expected," and it just got to be too much.  She asked for reduced hours, but didn't receive any schedule adjustment, so she quit.  (*Id*. at 45.)

- She currently sees her doctor for basic things or when something happens.  She had bronchitis about a month ago.  (*Id*. at 46.)

- She has trouble completing tasks.  At work, she would start ringing things up and then just leave them undone and walk away.  (*Id*. at 46-7.)

8

The VE testified Parker had past work as a service technician, performed at the heavy exertional level.  (*Id.* at 50-51.)  The ALJ then posed the following hypothetical question:

> Hypothetically, similar claimant, age, education, could lift, carry, push, and pull 20 pounds frequently, 50 pounds occasionally.  So you have the exertional level.  Sit, stand, walk six out of eight.  However, overhead reaching, with her left upper extremity, is frequent.  However, she's right hand dominant.  Now, no concentration or exposure to fumes, gases, odors, or other pulmonary irritants.  So that would rule out what she did?

(*Id.* at 51.)

The VE testified the hypothetical individual would not be able to perform Parker's past work as a service technician.  (*Id.* at 52.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as hand packager, store laborer, or kitchen helper.  (*Id.* at 53.)  However, Parker explained that heat exacerbated her breathing problems, which eliminated the job of kitchen helper.  (*Id.*)  The VE identified dining room attendant as an alternative representative job. (*Id.*)

Parker's counsel then questioned the VE, who explained that exposure to pulmonary irritants is measure by duration, not level, because levels are almost impossible to measure. (*Id.* at 56-7.) Parker explained she could not be in a room with someone who was wearing perfume, or anything that has a smell.  (*Id.* at 57.)  The VE testified that amending the hypothetical to eliminate all exposure to pulmonary irritants would potentially eliminate all work, because even in a workplace with no exposure to environmental restrictions, a person could come in wearing perfume.  (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any

9

medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can

10

perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Parker was insured on her alleged disability onset date,  April 26, 2016, and remains insured through December 31, 2022, her date last insured ("DLI.")  (Tr. 15.)  Therefore, in order to be entitled to POD and DIB, Parker must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  The claimant has not engaged in substantial gainful activities since April 26, 2016, the alleged onset date.

3.  The claimant has the following severe impairments: Chronic Obstructive Pulmonary Disease (COPD), left shoulder impingement syndrome, and obesity status post gastric bypass in 2014.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(c) except: She could perform frequent overhead reaching with the left upper extremity.  She requires work with no concentrated exposure to fumes, gases, odors, or other pulmonary irritants.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on September **, 1958 and was 57 years old, which is defined as an individual of advanced age, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching retirement age.

11

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 26, 2016, through the date of this decision.

(Tr. 15-22) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v.*

12

*Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");
*McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  First Assignment of Error: Opinions of the State Agency Reviewing Physicians

Parker asserts that the ALJ erred because his determination of her physical RFC is unsupported by substantial evidence.  (Doc. No. 16 at 6.)  She argues the ALJ failed to properly weigh the opinion of the State Agency medical consultants, the only medical opinions of record, and mischaracterized the evidence supporting them.  (*Id.* at 6-7.)  She also argues the ALJ erred by failing to develop the record regarding her treatment after 2016, noting that she testified at her hearing about receiving further treatment.  (*Id.* at 11.)

The Commissioner responds that the ALJ properly weighed the State Agency reviewing physicians' opinions, and gave a legally sufficient explanation of his reasoning.  (Doc. No. 18 at 5.) He argues that the ALJ did not mischaracterize the evidence, and had no duty to seek further records because the existing record sufficiently supported his decision.  (*Id.* at 7.)

The RFC determination sets out an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the

14

Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).[4]  As such, the ALJ bears the responsibility for assessing a claimant's RFC, and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* 20 C.F.R. § 416.946(c), SSR 96  8p, 1996 WL 374184 (SSA July 2, 1996).

In making an RFC determination, the ALJ is obligated to consider the record as a whole. *Hurst v. Secy'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (*citing Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). " '[W]here the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.' " *Davidson v. Comm'r of Soc. Sec.*, No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018) (quoting Moscorelli v. Colvin, No. 1:15-cv-1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016)) (citing SSR 96-8p, 1996 WL 374184, at *7); *see also* SSR 96  8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC

---

[4]       Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).  Parker's claim was filed on July 8, 2016, and the Court applies the regulations in effect at that time.  (Tr. 13.)

is for the ALJ to determine, it is well-established that the claimant bears the burden of establishing the impairments that determine her RFC. *See Her*, 203 F.3d at 391.

An ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.,* No. 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec*., No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014). This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion. *Snyder,* 2014 WL 6687227, at *10 (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)). However, "[j]udicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec*., No. 1:10 cv 804, 2012 WL 1028105 at *7 (W.D. Mich. Mar. 26, 2012) (citing *Mullins v. Sec'y of Health & Human Servs*., 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec*., 260 F. App'x 801, 807 (6th Cir. 2008)).

At step four, the ALJ made the following RFC determination:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(c) except: She could perform frequent overhead reaching with the left upper extremity. She requires work with no concentrated exposure to fumes, gases, odors, or other pulmonary irritants.

(Tr. 17.)

### i.    State Agency reviewing physicians' opinions

With respect to State Agency reviewing physicians' opinion, an ALJ must weigh their

16

opinions under the same factors[5] as treating physicians, including the supportability and consistency of the opinions, as well as the specialization of the physician.  *See* 20 C.F.R. § 416.927.  However, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2) (I).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.

The ALJ explained his treatment of the State Agency reviewing physicians' opinions as follows:

> the State Agency medical consultants found that the claimant could perform light work with postural restriction, frequent reaching with the left upper extremity, and no concentrated exposure to pulmonary irritants.  I afford little weight to these opinions, because the claimant maintained normal strength except for what her doctor described as "mild weakness" in the left upper extremity at one visit.  She had normal gait, not deficits related to the lower extremities, and normal sensation and reflexes to justify postural restrictions.  Imaging was normal.  The claimant had pain with left overhead reaching, but range of motion remained full consistent with an ability to perform frequent overhead reaching.  No further reaching limitations are supported in light of the good response to injections and lack of significant treatment since 2016.  I concur that the claimant must avoid concentrated exposure to pulmonary irritants.  Medium work is consistent with the normal objective imaging, relatively normal clinical findings, and good response to conservative treatment.  I considered obesity in reaching this conclusion, and find that medium work adequately accommodates this condition.

(Tr. 20) (internal citation omitted).

---

[5]    These factors include the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.  20 CFR §416.1527(c)(1)-(6).

17

The ALJ's RFC determination differed from the State Agency reviewing physicians' opinions in significant ways.  The State Agency reviewing physicians' opinions included greater reaching limitations, opining she was capable of limited reach left in front, laterally, and overhead. (Tr. 68-9, 81-2.)  They included movement limitation that Parker only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally crawl; and frequently balance, stoop, kneel, and crouch.  (*Id*.)  They also included more restrictive environmental limitations, opining she must concentrated exposure to temperature extremes, humidity, and vibrations, and avoid even moderate exposure to fumes, odors, gasses, and poor ventilation.  (*Id*.)  In addition, Dr. Mitgang, the second State Agency reviewer, opined that Parker had the added limitations of only occasionally balancing, kneeling, and crouching. (*Id*. at 79, 82.)

Parker asserts that the ALJ mischaracterized the medical record evidence because he described her imaging as "normal" when discussing her shoulder impairment, while the only imaging report in the medical record, an x-ray dates June 30, 2016, showed "down-sloping of the acromion" and assessed that Parker had "[l]eft shoulder pain due to impingement." (Doc. No. 16 at 10, citing Tr. 402.)  The Commissioner points out that the same record described her shoulder imaging as "essentially unremarkable," which he argues is equivalent to "normal." (Doc. No. 18 at 6, citing Tr. 402.)  Notably, both State Agency reviewing physicians described this record as showing "L shoulder - mild downsloping of acromion, otherwise neg." (Tr. 84.)  Although the ALJ paraphrased the contents of this record in a way that failed to capture their complexity, because the ALJ nevertheless found that "left shoulder impingement syndrome" was a "severe impairment" and

18

provided an accommodation limited Parker to frequent overhead reaching in his RFC determination,[6] this ill-chosen word does not constitute reversible error.

More significant is the ALJ's failure to acknowledge of some of the more restrictive limitations contained in the opinions.  The ALJ states that the State Agency reviewing physicians limited Parker to "no concentrated exposure to pulmonary irritants."  (Tr. 20.)  However, the opinions in the record state Parker to "avoid even moderate exposure" to fumes, odors, dust, gases, and poor ventilation.  (Tr. 69, 83.)  Nor does the ALJ acknowledge or address the difference in postural limitations between the two opinions.  Instead, he dismisses all the postural restrictions, noting "She had normal gait, not deficits related to the lower extremities, and normal sensation and reflexes to justify postural restrictions." (Tr. 20.)  All these conclusions are supported by the record. However, the ALJ fails to acknowledge or address evidence of postural impairment that appears to have been in the record considered by the second State Agency reviewing physician.  Dr. Mitgang's report twice specifically referenced a October 18, 2016 examination at the Dungy Orthopaedic Center showing bilateral knee osteoarthritis and an MRI showing patella femoral changes.[7]  (Tr. 78, 79.)  He describes the October 18, 2016 exam as follows:

> Dr. Dungy - c/c b/l knee pain.  Exam: well-hydrated, WN, NAD, very fit, very active.  No DME assistive devices and GOOD AMBULATION.  NO effusion

---

[6]    The ALJ explicitly based this more limited accommodation on medical record evidence showing that cortisone injections controlled Parker's shoulder pain. (Tr. 20, citing Tr. 436.)  She also testified at the hearing that, when she received shots, they controlled her pain for about six months, and that she had left the jobs she had attempted since her alleged onset date due to breathing problems.  (*Id*. at 41-2.)

[7]    This appointment took place approximately one month after Dr. Hutchinson completed her record review in September 2016, and probably accounts for the discrepancy in the postural limitations between the two opinions.

19

appreciated. Crepitus noted throughout motion bilaterally, (+)tenderness in the medical compartments bilaterally, Thigh & calf compartments are soft & non-tender. Dorsiflexion & plantar flexion is intact. Dx: OD b/l knees.

(Tr. 78.)  On the following page, he noted "An MRI shows patella femoral changes but preserved lat cmpt; various options were discussed by the PA, and she wanted to proceed with R knee surgery." (Tr. 79.)  Further, the index describes records relating to "osteoarthritic knee treatment" occurring on "10/18/2016" which appear to be omitted from the record.[8]   (Doc. No. 14 at PageID#: 80.)

The ALJ's decision makes no reference to these record documents, and it is unclear if he was aware that they exist, although Dr. Mitgang twice noted them as a basis for his opinion.  As discussed *infra,* the parties disagree on the scope of the ALJ's duty to develop the record.  However, at a minimum, the duty to ALJ "fully and fairly developed the record through a conscientious probing of all relevant facts" should include locating and considering the medical records specifically cited by evaluators at the prior stages of review, rather that simply concluding that no evidence supported those opinions. *Williams v. Astrue*, No. 1:11-cv-2569, 2012 WL 3586962, at *7 (N.D. Ohio Aug. 20, 2012).  Based on both the Court Transcript Index and Dr. Mitgang's report, it appears that Parker provided these documents to the Agency, and therefore fulfilled her responsibility in that instance.  Therefore, this case must be remanded to afford the ALJ the opportunity to locate and consider the orthopedic treatment records and MRI cited by State Agency reviewing physician Dr. Mitgang as the basis for his lower-body postural limitations, and more fully

---

[8]      Exhibit 5F describes itself as "Office Treatment Records Osteoarthritic knee, dated 6/30/2016 to 10/18/2016, from the DUNGY ORTHOPEDIC CENTER" (Doc. No. 14 at PageID#: 80.)  However, the records in Exhibit 5F actually document visits on June 30, 2016 and August 11, 2016, which were for treatment of Parker's left shoulder pain.  (Tr. 429-36.)  There is no record of the visit which Dr. Mitgang describes taking place on October 18, 2016, nor the accompanying MRI, that the undersigned could locate anywhere in the record.

explain his weighing of the State Agency reviewing physicians' opinions.

### ii.  Development of the record

Parker also asserts that the ALJ erred by failing to develop the record regarding her treatment after 2016.  She notes that she informed the ALJ at her hearing that she continued to receive cortisone shots every six months and had been referred for surgery.  (Doc. No. 16 at 11.)

While it is the ALJ's duty to fully develop the administrative record, an ALJ is permitted to presume a claimant represented by counsel has presented the best case before the ALJ.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 52 (6th Cir. 1983); *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 549 (6th Cir. 2002).  Ultimately, "[t]he burden of providing a complete medical record rests with the claimant."  *Weeks v. Shalala*, No. 94 5948, 1995 WL 521156, at *2 (6th Cir. Sept. 1, 1995) (Table).

Here, Parker's counsel informed the ALJ at the hearing that he was still trying to get records from her current primary care physician, Dr. Kristin Evan-Hymes.  (Tr. 33.)  He noted he had requested the records twice, most recently the week before the hearing, and they still had not been sent.  (*Id*.)  The ALJ agreed to keep the record open for two weeks following the hearing, and informed Parker's counsel "if you need for my office to subpoena those records, then you have to tell me."  (*Id*. at 34.)  During the hearing, the ALJ questioned Parker about the contents of the missing records, and she explained that she had bronchitis about a month prior to the hearing, but otherwise the records documented "just basic things    you know, I've [sic] already have the prescriptions for everything I need for my COPD.  But when something happens, I go back."[9]  (*Id*.

---

[9]    The records show that on February 18, 2019, Parker was treated for an upper respiratory infection, although records from other visits with Dr. Evan-Hymes describe her lungs as "clear to auscultation."  (Tr. 665, 660, 654, 649.)

at 45-6.)  She confirmed there were no additional x-rays or MRI imaging.  (*Id*. at 46.)

Parker does not contend that her counsel ever requested that the ALJ subpoena any treatment records.  Further, the record contains progress notes, dated December 9, 2016 through April 29, 2019, from Parker's primary care provider Dr. Evan-Hymes at Exhibit 11F.   Both her testimony and these records support the ALJ's statement that record showed a "lack of significant treatment since 2016."  (*Id*. at 20.)  The ALJ does not cite these records in his decision, except to note that "In December 2016, a physical examination was normal."  (*Id*. at 19.)  As noted *supra*, records cited by previous adjudicators appear to have disappeared from the record.  The Court concludes that the ALJ failed to fulfill his duty to fully develop the administrative record only to the extent that he failed to recognize that omission and recover those documents that were critical to earlier disability determinations in this case.  However, as discussed in section VI.B., below, he also failed to address evidence which is in contradiction to his findings, including the majority of the evidence from the period following Parker's move to Ohio, making it impossible for the Court to provide a meaningful review of his reasoning.  For these reasons, the case must be remanded for a more thorough reconsideration by the ALJ.

**B.**      **Second Assignment of Error: Analysis of Subjective Complaints**

Parker asserts that the ALJ's RFC determination is unsupported by substantial evidence because he failed to properly account for her subjective complaints. (Doc. No. 16 at 11.)  She asserts that he mischaracterized her testimony to make it appear as though she was less limited than she actually is.  (*Id*.)  Specifically, she disputes the ALJ's statement that she "left to retire in 2016, as opposed to ceasing work for any impairment related symptoms." (*Id*. at 13, citing Tr. 19.)  She also disputes the ALJ's statement that she "walked a mile between workstations and lifted up to 75

pounds when she was working, despite having greater symptoms at that time." (*Id.*)

The Commissioner responds that the ALJ did not err in finding that Parker's subjective symptom statements were not entirely consistent with the record. (Doc. No. 18 at 10.) He notes that Parker testified that her symptoms had improved since she stopped working, and that she took the retirement offer because of family obligations, rather than a physical inability to continue working. (*Id.* at 11-12.)

Parker's testimony contained contradictions. For example, when asked about why she left her job, she testified:

> I worked in a computer chip factory. . . they offered me, at the time, retirement. The only requirements were that I had to be there at least 15 years, and I had to be at least 55 years old, and I was already having a hard time with my breathing and everything. So I thought that would be the best option for me.

(Tr. 35.) However, when the ALJ questioned her further on this topic, they had the following exchange:

> Q:     [COPD's] not the reason you retired? You retired    it was a financial decision. It was age and benefit and you moved back here to take care of your mother, from what I'm reading here.
>
> A:     I am    I had to take custody of my granddaughter.
>
> * * * *
>
> Q:     It's not like you were medically    had to stop working?
>
> A:     No.

(Tr. 37.) Later in the hearing, her counsel questioned her on the same topic, and she testified:

> A lot of times the . . . smells of the chemicals . . . would bother me, and I'd become real short of breath . . . sometimes my tools were a mile apart. So I would have to go from one tool to the other tool to repair or find out what was going on with it.

23

(*Id*. at 39.)  She affirmed that she had a hard time walking the mile because of her breathing, and had "many, many" hospitalizations and call-offs, explaining:

> That's the biggest reason I decided to take the retirement, is because I was missing a lot of work, because of my breathing. I   when other people get colds, I would get bronchitis and I'd be out for weeks.

(*Id*. at 40.)

> The ALJ summarized these statements as follows:

> [Parker] testified that she retired from her job voluntarily.  When she worked, she lifted up to 75 pounds.  She cleaned tools and machines with alcohol and "a lot of different chemicals."  She walked a mile between tools.  Although cleaning with chemicals and walking aggravated COPD, the claimant continued this work until retirement.  Breathing improved since retirement, when the claimant was no longer exposed to cleaning chemicals.

(*Id*. at 18.)  He later asserted that Parker "left to retire in 2016, as opposed to ceasing work for any impairment related symptoms."  (*Id*. at 19.)  Both these descriptions entirely omit Parker's testimony that one of the factors that influenced her to retire was that she was often absent from work due to her COPD, which is supported by medical record evidence that she was on a medical leave as a result of her breathing problems from February 15, 2016 until March 27, 2016, only one month prior to her retirement date of April 26, 2016.  (*Id*. at 344, 603.)

It is well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 2016 WL 4150919, at *6 (6th Cir. Aug. 5, 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g.,*

24

*Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Smith v. Comm'r of Soc. Sec.*, No. 1:11 CV 2313, 2013 WL 943874 at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783 at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes").  On the other hand, the Court of Appeals has made clear that, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

Here, the ALJ failed to acknowledge the sections of Parker's testimony and the medical record that supported her claims of impairment.  Although the Commissioner accurately asserts that there is significant evidence supporting the ALJ's decision, it is not sufficient for the ALJ to acknowledge only the evidence which supports his conclusion.  He must also acknowledge evidence which is in contradiction to his findings, and provide "a reasoned basis for rejecting these findings." *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 at *6.  In cases such as this, where "relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

The ALJ's assertion that Parker was working up to the time of her retirement is not consistent with her testimony and the medical record, which supports her testimony that she was frequently absent due to illness before retiring.  Nevertheless, this alone would not constitute grounds

for remand, as the evidence relates to the period immediately preceding her alleged onset date. However, because remand is necessary based on the missing medical record evidence relating to her lower-body postural limitations, on remand, the ALJ should also more throughly explain his analysis of the evidence that medical limitations influenced Parker's voluntary retirement.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is Vacated and Remanded for further consideration consistent with this opinion.  On remand, the ALJ must locate and consider the orthopedic treatment records and MRI cited by State Agency reviewing physician Dr. Mitgang as the basis for his lower-body postural limitations; and more fully explain both his weighing of the State Agency reviewing physicians' opinions, and his analysis of the evidence that medical limitations influenced Parker's voluntary retirement.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date:   May 24, 2021